[No. 35170. *En Banc.* July 31, 1959.]

THE STATE OF WASHINGTON, *on the Relation of Washington Toll Bridge Authority,* Plaintiff, v. CLIFF YELLE, *as State Auditor, Respondent,* DALE L. YUST *et al., Intervenors.*[1]

[1]Reported in 342 P. (2d) 588.

*The Attorney General, Weter, Roberts & Shefelman* and *Harold S. Shefelman, Special Assistants,* and *John S. Robinson* and *Stanton P. Sender, Assistants,* for plaintiff.

*The Attorney General, Robert F. Hauth* and *Robert J. Doran, Assistants,* for respondent.

*Chadwick, Chadwick & Mills (Stephen F. Chadwick, Jr.,* of counsel), for intervenors.

*Slade Gorton (Pendleton Miller* and *Grosscup, Ambler, Stephan & Miller,* of counsel). and *Robert W. Graham* and *Edward G. Dobrin (Bogle, Bogle & Gates* and *George N. Prince,* of counsel), *amici curiae.*

HILL, J.—The plaintiff, Washington Toll Bridge Authority, seeks a writ of mandate from this court, directing the State Auditor to sign certain revenue bonds to be issued pursuant to Washington Toll Bridge Authority Resolution No. 338 to finance the construction of a toll bridge to cross Lake Washington from a site in the vicinity of Union Bay,

on the west side, to Evergreen Point, on the east side of the lake.

By Laws of 1957, chapter 266, p. 1037, the legislature authorized the toll bridge authority to issue its revenue bonds to provide funds for the construction of an additional Lake Washington bridge. Section 2 of the act contains the following covenant with the bondholders:

"Said revenue bonds shall constitute obligations only of the Washington toll bridge authority and shall be payable both principal and interest solely from the tolls and revenues derived from the operation of said toll facility as hereinbefore constituted. Said bonds shall not constitute an indebtedness of the state of Washington and shall contain a recital on the face thereof to that effect, and shall be negotiable instruments under the law merchant. Such bonds shall include a covenant that the payment or redemption thereof and the interest thereon are secured by a first and direct charge and lien on all of the tolls and other revenues received from the operation of said toll facility and from any interest which may be earned from the deposit or investment of any such revenues, except for payment of costs of operation, maintenance and necessary repairs of said facility. The tolls and charges to be imposed shall be fixed in such amounts so that when collected they will produce revenues that shall be at least equal to expenses of operating, maintaining and repairing said toll facility, including all insurance costs, amounts for adequate reserves and coverage of annual debt service on said bonds, and all payments necessary to pay the principal thereof and interest thereon." ·

The bonds are to be paid solely from the tolls and revenues derived from the operation of the bridge. However, the State Highway Commission is authorized by Laws of 1959, Ex. Ses., chapter 11, p. 1700 (hereafter referred to as the 1959 Supplemental Appropriations Act), to pledge not to exceed seven hundred fifty thousand dollars each year out of the proceeds of the excise taxes imposed on motor vehicle fuels to guarantee the payment of principal and interest of the bonds, should the tolls collected in any year be insufficient for that purpose. Tolls may be continued on the bridge until the Motor Vehicle Fund is reimbursed for any payments it may have made on the

principal and interest on the bonds in consequence of this guarantee. This pledge is referred to in the bonds, and they are made a lien not only on "all of the tolls and other revenues received from the operation of said bridge," but

". . . upon the proceeds of excise taxes imposed on motor vehicle fuels . . . pledged pursuant to Chapter 11 of the 1959 Extraordinary Session Laws of the State of Washington in an amount not to exceed $750,000.00 per year, . . ."

It is this authorization of the State Highway Commission to pledge a portion of the proceeds of excise taxes imposed on motor vehicle fuels for payment of the bridge bonds, if its revenues from tolls are insufficient for that purpose, which the State Auditor has challenged as unconstitutional, and which, together with certain claimed defects in the resolution authorizing the bond issue, forms the basis for his refusal to sign the bonds.

The 1959 Supplemental Appropriations Act is some seventeen pages in length, but contains only two sections, one of which is a one-sentence declaration of emergency. It contains many specific appropriations for many purposes. For subsequent reference we set out the title and all of the act pertinent to this proceeding:

"AN ACT Adopting the supplemental budget and making appropriations for miscellaneous purposes, and declaring an emergency.

"BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

"Section 1. The following sums, or so much thereof as shall severally be found necessary, are hereby appropriated out of the several funds indicated, for the fiscal biennium beginning July 1, 1959 and ending June 30, 1961, except as otherwise provided.

" . . .

"STATE HIGHWAY COMMISSION

"(1) Motor Vehicle Fund Appropriation for the following purposes: 100,000.00

"The state highway commission may, at the request of the toll bridge authority, pledge such sum to guarantee the payment of principal and interest on bonds issued by the authority in connection with construction of a second Lake Washington toll bridge, at a site to be determined

by the toll bridge authority, or any subsequent refunding bond issues or for sinking fund requirements or reserves established by the authority with respect thereto. To the extent of any such pledge the state highway commission shall use such moneys to meet such obligations as they arise but only to the extent that revenues of the project are insufficient therefor.

"(2) The state highway commission at the request of the toll bridge authority is further authorized to pledge the proceeds of excise taxes imposed on motor vehicle fuels now directed by law to be deposited in the motor vehicle fund available for state highway commission purposes in an amount not to exceed seven hundred fifty thousand dollars per year for the purposes set forth in subparagraph (1) above.

"(3) Whenever the state highway commission shall have made a pledge of motor vehicle funds as authorized in subparagraphs (1) and (2) above, the legislature agrees to continue to impose excise taxes on motor vehicle fuels in amounts sufficient to provide the state highway commission with funds necessary to enable it to comply with such pledge and to make necessary appropriations to the state highway commission for such purposes.

"(4) Any money from the motor vehicle fund used by the state highway commission for payment of principal or interest on any bond issue of the toll bridge authority to finance a second Lake Washington toll bridge shall be repaid to the motor vehicle fund to be used for state highway purposes, from revenues of such project and tolls may be continued for any required additional length of time necessary for this purpose."

It should be noted that subparagraph (1) is an appropriation of one hundred thousand dollars from the Motor Vehicle Fund. The Motor Vehicle Fund includes:

"All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, . . ." Art. II, § 40, Washington state constitution (amendment 18).

The seven hundred and fifty thousand dollars per year, referred to in subparagraph (2), is from a specifically designated portion of the Motor Vehicle Fund, *i.e.*, "pro-

ceeds of excise taxes imposed on motor vehicle fuels." By subparagraph (3), the legislature agrees to continue to impose the excise tax on motor vehicle fuels in an amount sufficient to provide the funds necessary to make available the seven hundred fifty thousand dollars.

The State Auditor is correct in his contention that subparagraphs (2), (3), and (4) of the appropriation to the State Highway Commission introduce a new subject not germane to the appropriation, or to subparagraph (1), and constitute a clear violation of Art. II, § 19, of the Washington state constitution, which says:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

It is conceded that there can be no continuing appropriation, and that the only valid amount here appropriated from the Motor Vehicle Fund is one hundred thousand dollars.'

The vigorous attempt to justify the inclusion in an appropriation act of an authorization to the State Highway Commission to divert annually for an indefinite period three-quarters of a million dollars from the proceeds of a specific excise tax to the Toll Bridge Authority to guarantee the payment of principal and interest of certain revenue bonds (if needed), amounts to no more than saying, "if you are willing to follow us, we can show how others have found a way around the constitutional provision in question."

We are not interested in a way around. The constitutional provision requiring that every law shall embrace but one subject was written into the constitution of many states, because (as the Maryland Court of Appeals says)

". . . there had crept into our system of legislation a practice of engrafting upon measures of great public importance foreign matters for local or selfish purposes, and the members of the Legislature were often constrained to vote for such foreign provisions to avoid jeopardizing the main subject or to secure new strength for it, whereas if these provisions had been offered as independent measures they would not have received such support. . . ."

*Neuenschwander v. Washington Suburban Sanitary Comm.* (1946), 48 A. (2d) 593, 598, 599.

Without the protection created by the constitutional requirement above quoted, appropriation bills would be peculiarly vulnerable to this legislative evil. Indicating that appropriation bills are distinctive, this court said in *State ex rel. Blakeslee v. Clausen* (1915), 85 Wash. 260, 272, 148 Pac. 28, 32:

". . . An appropriation bill is not a law in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. It is purely *lex scripta*. It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government. Such bills pertain only to the administrative functions of government. . . ."

Appropriation bills are made temporary in nature by the provisions of Art. VIII, § 4 (amendment 11), which require that all expenditures of moneys appropriated be made within one calendar month after the end of the fiscal biennium.

■ It follows that, if legislation of a general and continuing nature is to be passed, it cannot come under the subject of appropriations; yet that is exactly what has been done here. Coupled with the appropriation of one hundred thousand dollars, made in subparagraph (1), is the provision in subparagraph (2) that gives the State Highway Commission the continuing authority to pledge a portion of the proceeds of the tax on motor vehicle fuels to guarantee the payment of principal and interest on the bonds issued to finance this bridge. The grant of this *continuing authority* creates a rule of action, a segment of substantive law, to be effective far beyond the period of the biennium in which appropriations can constitutionally have effect. We cannot see how this grant of continuing authority to pledge further moneys from the Motor Vehicle Fund can be said merely to "qualify" the one-hundred-thousand-dollar appropriation contained in subparagraph (1). It in no way affects the purpose of the appropriation, or creates conditions to its disbursement;

nor is it in any way necessary for the appropriation's taking effect as contemplated.

Added to this is subparagraph (3) by which the legislature agrees to continue its excise taxes on motor vehicle fuels, and to make such appropriations as are necessary to make the State Highway Commission's pledges effective. An obligation is here created which has effect far beyond the biennium. It is patently more than just a qualification upon the one hundred thousand dollars appropriated for the present biennium. It is undoubtedly germane to the grant of authority to the State Highway Commission contained in subparagraph (2), but has no possible relevance to the appropriation.

If the "selfish purpose," of transforming revenue bonds into bonds partially guaranteed by a continuing pledge of three-quarters of a million dollars each year from the proceeds of the tax on motor vehicle fuels, is to be accomplished, it should be on its own merits, and not stowed away as subparagraphs (2), (3), and (4) of an appropriation of one hundred thousand dollars in an act which has as its title:

"AN ACT Adopting the supplemental budget and making appropriations for miscellaneous purposes, and declaring an emergency."

■ We have here a second subject in the same bill (and a subject not covered by the title), and, consequently, a double violation of Art. II, § 19. *Washington Toll Bridge Authority v. State* (1956), 49 Wn. (2d) 520, 304 P. (2d) 676; *Power, Inc. v. Huntley* (1951), 39 Wn. (2d) 191, 235 P. (2d) 173. See Ruud, "No law shall embrace more than one subject," 42 Minn. L. Rev. 389 (1958).

■ It is equally apparent that the portion of the 1959 Supplemental Appropriations Act, with which we are concerned, violates Art. II, § 37, of the state constitution, which provides,

"No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

Subparagraph (1), heretofore referred to and quoted in full on page 670, provides that the principal and interest of the bonds issued by the Toll Bridge Authority "in connection with construction of a second Lake Washington toll bridge" may be 'paid from the one hundred thousand dollars appropriated from the Motor Vehicle Fund if the "revenues of the project are insufficient" for that purpose. Subparagraph (2) authorizes the use of "seven hundred fifty thousand dollars per year" from the proceeds of excise taxes imposed on motor vehicle fuels, for a like purpose.

These two subparagraphs obviously amend that portion of the Laws of 1957, chapter 266, § 2, which states that the revenue bonds which the Toll Bridge Authority may issue for the second Lake Washington toll bridge "shall be payable both principal and interest solely from the tolls and revenues derived from the operation of said toll facility."

The 1957 law does more than restrict the power of the Toll Bridge Authority; it restricts the sources available for payment on the bonds. New powers are created, which come from the clearly substantive provisions of the 1959 Supplemental Appropriations Act, and which definitely amend the restriction as to the source of payment.

We do not regard it as material that any amounts taken from the Motor Vehicle Fund to pay principal and interest on the bonds will ultimately be repaid from tolls and revenues of the bridge. Moneys of the Motor Vehicle Fund are being made available to guarantee prompt payment of principal and interest on these bonds, and this constitutes a provision substantially at variance with the restriction on the source of payment which is a part of the 1957 act.

The purpose of Art. II, § 37, of our state constitution has been stated, as follows, in *State ex rel. Gebhart v. Superior Court* (1942), 15 Wn. (2d) 673, 685, 131 P. (2d) 943, 949:

"The section of our constitution above referred to was undoubtedly framed for the purpose of avoiding confusion, ambiguity, and uncertainty in the statutory law through the existence of separate and disconnected legislative provisions, original and amendatory, scattered through differ-

ent volumes or different portions of the same volume. Such a provision, among other things, forbids amending a statute simply by striking out or inserting certain words, phrases, or clauses, a proceeding formerly common, through which laws became complicated and their real meaning often difficult of ascertainment. The result desired by such a provision is to have in a section as amended a complete section, so that no further search will be required to determine the provisions of such section as amended."

As indicated above, the effect of the portion of the 1959 Supplemental Appropriations Act, now under consideration, is to strike out the word "solely" from § 2, chapter 266, Laws of 1957, and this is clearly amendatory.

The challenged portion of the 1959 Supplemental Appropriations Act is unconstitutional for the reasons indicated.

We do not attempt to pass on the other constitutional issues raised by the State Auditor and the intervenors.

Our decision on the constitutional issues involved makes it unnecessary to discuss the validity of certain provisions of the Toll Bridge Authority's Resolution No. 338, which have been challenged by the State Auditor. It is obvious that the Toll Bridge Authority cannot, by resolution, take a position in conflict with the terms and conditions imposed upon the authority by the Laws of 1957, chapter 266, which authorized the construction of the bridge with which we are here concerned. Neither can it abdicate authority with which it has been invested; nor can it delegate authority which is nondelegable. It follows from what has already been said that any attempt to change the character of revenue bonds, to bonds guaranteed in part by the annual pledge of seven hundred fifty thousand dollars of highway trust funds (see amendment 18 of the Washington state constitution), is beyond its authority. See *State ex rel. Eastvold v. Maybury* (1956), 49 Wn. (2d) 533, 304 P. (2d) 663.

The State Auditor properly refused to sign bonds issued under the authority of Washington Toll Bridge Authority Resolution No. 338, in reliance upon the terms of the quoted portion of the 1959 Supplemental Appropriations Act.

No portion of the 1959 Supplemental Appropriations Act is affected by this decision, except the appropriation to the State Highway Commission.

This does not mean that the bridge across Lake Washington need be delayed. It is clear that chapter 266, Laws of 1957, gives requisite authority to proceed. The seven hundred fifty thousand dollars a year, which counsel say would probably never be used, falls far short of being sufficient to guarantee even the annual interest on thirty million dollars worth of bonds; but it is an entering wedge. If the court were to approve the method used here to make a token guarantee from tax sources of what are supposedly revenue bonds, it would afford the precedent for complete guarantees from tax sources by a similar procedure.

The writ of mandate is denied.

WEAVER, C. J., DONWORTH, OTT, and FOSTER, JJ., concur.

MALLERY, J. (dissenting)—This is an original proceeding in which plaintiff seeks a writ of mandate to require the auditor of the state of Washington to sign certain bonds to be issued pursuant to Washington Toll Bridge Authority Resolution No. 338, to finance a bridge to be constructed across Lake Washington at a site in the vicinity of Union Bay and Evergreen Point. The bonds are to be paid out of tolls, but the State Highway Commission is to pledge not to exceed seven hundred fifty thousand dollars a year out of the Motor Vehicle Fund toward payment on the bonds to make up any deficiency in the tolls that may occur in any year. The Motor Vehicle Fund is to be reimbursed, in case any such payments are necessary, out of tolls before they can be taken off of the bridge.

These qualifications are imposed upon an appropriation of one hundred thousand dollars for this biennium. The majority opinion takes the position that these qualifications constitute, in fact, a second subject separate and apart and unrelated to the appropriation, and that it, therefore, offends the constitutional prohibition against a bill containing more than one subject.

An appropriation is necessary to implement most acts

of the legislature. In succeeding bienniums the recurring appropriations needed are commonly found in general appropriation bills. The subjects of the various acts thus implemented are not imported into the appropriation bills so as to violate the constitutional prohibition against more than one subject in a bill. This is logically inescapable because appropriations cannot be made in a vacuum. There must be an existing statutory purpose and persons authorized to act in relation to the appropriations. Within that framework, however, the appropriations can be as qualified, restricted, contingent, and conditional as the legislature chooses to make them. The specific question, therefore, is: Do the provisions in question merely qualify the appropriation, or do they, in fact, create a new purpose, program, or project not authorized by existing law so as to intrude a second subject into the bill?

I think the provisions in the Supplemental Appropriation Bill, here in question, are merely qualifications on the appropriation of one hundred thousand dollars for the present biennium as provided in § 1 (1) thereof, which can be administered by *existing* authorities pursuant to *existing* authorizations. This is so because § 1 (4) thereof provides for the reimbursement to the *existing* Motor Vehicle Fund for any payments out of it on the toll bridge bonds to be issued by the *existing* Toll Bridge Authority pursuant to an *existing* bridge program, in the event that payments should become necessary under § 1 (1). Payments in future bienniums are *limited* in § 1 (2) to seven hundred fifty thousand dollars a year (which, of course, require future appropriations for each succeeding biennium), and the legislature in § 1 (3) pledges to the bondholders it will continue to impose the *existing* excise tax on motor fuels and appropriate them as necessary for this *existing* highway purpose.

Notwithstanding the existence under prior law of the toll bridge program for which the appropriation is made and the existence of the agencies that are directed as to the manner in which the appropriation is to be expended, the majority opinion, nevertheless, holds that the qualifica-

tions and directions constitute a second subject of the act for the reason that they will survive the present biennium and apply to the future appropriations which are indispensable to the long-range program. This seems to be put upon the theory that a biennial appropriation must be an isolated program complete in itself and not related to any comprehensive highway plan.

I cannot agree. I think the state constitution does not compel such a hodgepodge of small unconnected projects. Road and bridge projects extend over many years and each appropriation contemplates many subsequent related appropriations. Bonds for every major public purpose require many bienniums for their retirement. Our constitutional forefathers did not intend to outlaw the imposition of conditions upon appropriations or require that the conditions be limited by their terms to a period of two years.

A negative test of the existence of a second subject in a bill is the question of whether or not the second subject would still exist if the first subject were stricken. If it would not, it is merely part of the first subject. By this test there is no second subject in the act in question.

I now comment on other contentions made by the parties, some of which are not discussed in the majority opinion.

It is contended that the Supplemental Appropriation Bill violates Art. II, § 37, of the state constitution, which reads:

"No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

This contention is based upon Laws of 1957, chapter 266, § 2, p. 1037 [cf. RCW 47.56.282], which reads, inter alia:

"Said revenue bonds shall constitute obligations only of the Washington toll bridge authority and shall be payable both principal and interest *solely* from the tolls and revenues derived from the operation of said toll facility as hereinbefore constituted. . . ." (Italics mine.)

It is contended this section, providing for paying loans *solely* out of tolls, is amended by the Supplemental Appropriation Bill because it pledges the use of the Motor

Vehicle Fund, in addition to the tolls, if this becomes necessary to meet accrued payments on the bonds.

There are two answers to this contention. (1) The bill is an authorization to the State Highway Commission to act in relation to the Motor Vehicle Fund, which is already under its control by existing law. It does not confer authority over the Motor Vehicle Fund upon the Toll Bridge Authority, whose powers are still limited *solely* to the expenditure of tolls. The proper use of the Motor Vehicle Fund can be found in the eighteenth amendment to the state constitution, which created it. Therein it is provided that the Motor Vehicle Fund can be used to build and maintain bridges. The authorization in the Supplemental Appropriation Bill regarding the Motor Vehicle Fund is directed to the State Highway Commission only and does not amend the authority of the Toll Bridge Authority in any way.

(2) In any event, the bonds are payable ultimately *solely* out of tolls. The Toll Bridge Authority has existing authority to borrow funds to build bridges. Indeed, the bonds in question are merely such a loan. There is no provision in the Toll Bridge Authority act limiting the Toll Bridge Authority to the issuance of bonds as an exclusive method of borrowing funds. It can accept a loan from the Motor Vehicle Fund if the State Highway Commission authorizes it pursuant to an act of the legislature. Repayment of such a loan must be made *solely* out of tolls just as in the case of bonds. In short, if any moneys are paid out of the Motor Vehicle Fund, they will constitute loans to the Toll Bridge Authority and will be repayable out of tolls. This course of action, as contemplated by the Supplemental Appropriation Bill, is in full accord with the existing powers of the Toll Bridge Authority and the State Highway Commission.

It is contended that the provision in § 1 (3) of the Supplemental Appropriation Bill in which the legislature agrees to continue to impose excise taxes on motor vehicle fuels and make future appropriations from the Motor Vehicle Fund, if needed under the terms of the pledge, is an at-

tempt to make a continuing appropriation in violation of the eleventh amendment to the state constitution, which specifically limits the appropriation powers of the legislature to two-year periods. The amendment provides:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

It must be conceded at once that § 1 (3) does not and cannot constitute an appropriation, present, continuing or otherwise, and that the agreement of the legislature to continue to make future appropriations out of the Motor Vehicle Fund, if needed to meet accruing bond payments, is not binding upon future legislatures and, at best, is the mere expression of a present intention regarding future legislation. The pledge is, nevertheless, desirable from the bondholders' point of view, because of its persuasive effect as a moral obligation. The fact that the pledge is not binding upon future legislatures does not invalidate the obligation of the bonds, but only concerns the existence or nonexistence of remedies for breach of the promise regarding future legislation should such a breach occur. It may very well be that there is no remedy for such a breach, since the courts cannot by mandamus compel the legislature to act in any particular way, or at all. Lack of this remedy does not affect the obligation, however.

The *pledge* not to repeal the *existing* law, under which the levies of excise taxes are made which comprise the Motor Vehicle Fund, is upon a different footing because such a pledge is contractual in nature (See *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651), and it would be the duty of this court to invalidate a bill repealing the *existing* statute as violative of Art. I, § 10, of the United

States constitution, and Art. I, § 23, of the state constitution, prohibiting "impairing the obligations of contracts." This court cannot compel passage of a bill, but it can invalidate one that is unconstitutional.

It is contended that such a contractual provision relating to excise taxes is a second subject not expressed in the title of the Supplemental Appropriation Bill, and that it, therefore, invalidates the act.

I do not agree. A qualification on an appropriation is within the scope of the subject of the appropriation bill in which it is contained. Such a qualification is, therefore, valid and, when incorporated in the bonds, confers a contractual right upon the bondholders, since bonds are merely specialized and formal contracts.

It is contended that the pledge of the Motor Vehicle Fund to secure the bonds of the Toll Bridge Authority is prohibited by both Art. VIII, § 5, and Art. XII, § 9, of the state constitution. The former prohibits the loan of state credit to individuals, associations, companies, or corporations. It applies to *private* entities, not state agencies such as the Toll Bridge Authority. The latter prohibits the state from loaning its credit or subscribing to stock in any company, association, or corporation. It also does not apply to governmental bodies. See *Rands v. Clark County,* 79 Wash. 152, 139 Pac. 1090.

It is contended that the contractual obligation to continue levying the excise tax on motor fuels violates the fourteenth amendment to the state constitution, which reads, *inter alia:*

"The power of taxation shall never be suspended, surrendered or contracted away. . . ."

The case of *Gruen v. State Tax Comm., supra,* squarely rules contrary to this contention. We are asked to overrule it in that regard. I am not prepared to do so.

It is contended that the Supplemental Appropriation Bill violates the seventh amendment to the state constitution in that it constitutes a delegation of legislative authority without adequate legislative standards to the Toll Bridge

Authority and the State Highway Commission by virtue of which they are to determine the amount of money, if any, to be paid on the bonds out of the Motor Vehicle Fund. The same contention is made regarding the number of years during which such determinations are to be made.

I do not agree. There is no legislative discretion involved which requires any legislative standards for compliance therewith, since mathematical computations will exactly fix both determinations.

It is contended there are not adequate legislative standards set up in Laws of 1957, chapter 266, p. 1037, *supra,* which authorized the construction of the bridge as to the question of selecting its location.

The act locates it ". . . across Lake Washington at a site in the vicinity of Union Bay and Evergreen Point *or at such other location across Lake Washington which is deemed feasible by the authority."* (Italics mine.) Since the Toll Bridge Authority has now located it between Union Bay and Evergreen Point, the vagueness of the italicized language can be treated as mere surplusage.

It is contended that the Motor Vehicle Fund cannot be used as a guarantee-reserve fund as contemplated by the Supplemental Appropriation Bill because of the language of the eighteenth amendment to the state constitution, which provides, *inter alia:*

"All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. . . ."

The meaning of the words "highway purposes," it is contended, is broad enough to permit the purchase of the bonds or outright payment for the construction of the bridge, but not to permit the holding of the funds *out of use,* which would result from the maintenance of a *reserve* to guarantee payment of the bonds. In short, it is con-

tended that the Motor Vehicle Fund must be a working fund, not a *reserve fund.*

The pertinent language of the Supplemental Appropriation Bill reads:

" . . . To the extent of any such pledge the state highway commission *shall use such moneys to meet such obligations as they arise* but only to the extent that revenues of the project are insufficient therefor. . . . " (Italics mine.)

Payments are to be made out of the Motor Vehicle Fund itself as soon after the need is established as there is money in the fund with which to make them. The statute does not contemplate a special *reserve* fund within the Motor Vehicle Fund. Hence, we do not reach the contention regarding such a fund.

It is contended that the Toll Bridge Authority exceeded the powers conferred upon it by the legislature when it provided in its Resolution No. 338, *supra,* which is the one authorizing the bond issue, that it would not construct another bridge either toll or free across Lake Washington so long as any bonds are outstanding and unpaid and until certain other conditions are met. This contention is put upon the grounds that the Toll Bridge Authority cannot contract away its power and duty to build bridges, and that the resolution ignores the statutory prohibition against the construction of a competing bridge within a distance of ten miles.

I do not agree. The Toll Bridge Authority is empowered by RCW 47.56.060 to make agreements, *not inconsistent with law,* for safeguarding its funds and revenues with which to defray the cost of bridge construction. It is true the Toll Bridge Authority could not make an affirmative agreement to build a bridge within ten miles of an existing toll bridge *in violation of the statute.* There is no statutory prohibition *against a negative agreement not to* build a *competing* bridge until the bonds are paid. This provision is necessary as a matter of administrative determination in order to make the bonds salable. No justiciable question is presented by this determination.

It is contended that the Toll Bridge Authority's agreement not to reduce the schedule of tolls without first obtaining a certificate based upon the statistical studies of certain traffic engineers is invalid. The act creating the Toll Bridge Authority vested in it the exclusive authority to fix tolls and prescribed minute legislative standards therefor.

I agree that this authority cannot be delegated by the Toll Bridge Authority to private parties, nor can they be allowed to exercise the power of an absolute veto over toll schedules. However, one of the standards prescribed by the legislature is that the tolls must be sufficient to meet the payments on the bonds. This is also the purpose sought to be served by the challenged agreement.

The permissible extent of the agreement, therefore, is that the Toll Bridge Authority will afford the traffic engineers, as representatives of the bondholders, the opportunity to submit advisory, not mandatory, findings of fact regarding the effect any contemplated reduction of tolls would have upon the adequacy of the revenues to meet bond payments. So understood and so limited, the agreement in question is unobjectionable. This means, therefore, that any remedy available to the bondholders must be for arbitrary and capricious action on the part of the Toll Bridge Authority in not following the mandate of the statute as to the adequacy of the toll schedules, rather than by enforcing any purported power of the traffic engineers over them.

It is contended that the Supplemental Appropriation Bill, which provided for the guarantee of the bond payments out of the Motor Vehicle Fund, is violative of the debt limitation of four hundred thousand dollars prescribed in Art. VIII, § 1, of the state constitution.

I do not agree. Even if we should assume there is a valid obligation to pay seven hundred fifty thousand dollars annually out of the Motor Vehicle Fund, it is still not a debt within the meaning of the constitutional prohibition. I subscribe to the language of the concurring

opinion in *State ex rel. Bugge v. Martin,* 38 Wn. (2d) 834, 232 P. (2d) 833, in which it was said, regarding the Motor Vehicle Fund, that:

"The revenues involved in this case are essentially charges for the use of the highways and, in principle, do not differ from tolls charged for the use of highway bridges. No one who does not use the highways for motor vehicle transportation is compelled to contribute toward their construction or maintenance."

The bridge is to be an integral part of the state highway system, and the moneys in the Motor Vehicle Fund are derived exclusively from the users thereof. When the obligation to defray the cost of construction of a thing is put exclusively upon the users, it is not subject to the constitutional limitation in question, which contemplates only the general obligations of the state.

The writ should issue. I dissent.

FINLEY, ROSELLINI, and HUNTER, JJ., concur with MALLERY, J.

October 5, 1959. Petition for rehearing denied.